# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Duke and King Acquisition Corp. | Case No. 10-38652 |
| | Chapter 11 Case |
| Debtor. | |

| | |
|---|---|
| Duke and King Missouri, LLC | Case No. 10-38653 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Missouri Holdings, Inc. | Case No. 10-38654 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Real Estate, LLC | Case No.10-38655 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| DK Florida Holdings, Inc. | Case No. 10-38656 |
| Debtor. | Chapter 11 Case |

## NOTICE OF HEARING AND JOINT MOTION FOR (I) EXPEDITED RELIEF AND (II) INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS' USE OF UNENCUMBERED CASH OR, IN THE ALTERNATIVE, CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION

TO:     The parties-in-interest as specified in Local Rule 9013-3(a)(2):

1.      Duke and King Acquisition Corp., Duke and King Missouri, LLC and the other debtors named above (collectively, the "Debtors"), by and through their legal counsel, respectfully move the Court for the relief requested below and give notice of hearing.

2.      The Court will hold hearings on this Motion at a time and location that have not been determined.  The Debtors will request that the Court hold a hearing on the interim relief requested in this Motion on December 7, 2010, in the Federal Courthouse in either Minneapolis, Minnesota or St. Paul, Minnesota.  The Debtors will seek a hearing date for the final relief sought in this Motion on or after December 20, 2010.  The Debtors will provide separate notice

of the time and location of the hearings.  Alternatively, parties-in-interest may contact Debtors'
counsel for hearing information.

3.	Local Rule 9006-1(b) provides deadlines for responses to this Motion. However,
given the expedited nature of the relief sought with respect to the portion of the Motion seeking
an **interim order**, the Debtors do not object to written responses being served and filed
immediately prior to the hearing.  Any response to the Motion for a **final order** must be filed and
served by mail not later than five (5) days before the time set for the hearing (including
Saturdays, Sundays, and holidays).  **UNLESS A RESPONSE OPPOSING THE MOTION IS
TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**.

4.	This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and
1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.  This is a core proceeding.  The petitions
commencing the Debtors' chapter 11 cases were filed on December 4, 2010 (the "Petition
Date").  The cases are now pending before this Court.

5.	This Motion arises under 11 U.S.C. §§ 105, 361, 363(c)(2) and 363(e), and Fed.
R. Bankr. P. 4001(b).  This Motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 9013
and 4001-2.

6.	Out of an abundance of caution, the Debtors request an order authorizing the
Debtors to use their unencumbered cash in which Bank of America, N.A., as administrative
agent ("BofA"), Warren Capital Corporation ("Warren"), The Coca-Cola Company ("Coca-
Cola"), Duke Manufacturing Company ("Duke") and/or Meadowbrook Meat Company, Inc.
("MMC," and collectively with BofA, Warren, Coca-Cola, and Duke, the "Secured Creditors"),
each may claim an interest.  The Debtors are in the fast food restaurant business, providing sit-
down meals to their customers.  As a result, the cash generated from the operation of the

Debtors' businesses represents payment for services, rather than from the purchase of goods or consumption of inventory. Accordingly, under applicable law, the cash generated by the operation of the Debtors' businesses does not constitute cash collateral of the Debtors' Secured Creditors. The Debtors request an interim order authorizing the Debtors to use their cash on an interim basis from the date of the interim hearing through the date of a final hearing, and a final order authorizing it to use their cash through and including March 25, 2011.

**RULE 4001 STATEMENT**

7.      Pursuant to Fed. R. Bankr. P. 4001(b), the Debtors request an order authorizing continued use of their cash in which the Secured Creditors identified in paragraph 6 above claim or may claim to hold an interest. The Debtors will use the cash to continue their operations and preserve the going-concern value of their assets.

8.      The Debtors request interim authorization to use only the amount of cash that is necessary to avoid immediate and irreparable harm to their bankruptcy estates pending a final hearing, and the amounts indicated on the budget attached hereto as Exhibit A, without material deviation, through December 31, 2010, and final relief through March 25, 2011.

9.      If the relief is granted, the Debtors would be authorized to make the expenditures provided for in each budget monthly, and if necessary, to exceed the amounts set forth in each respective budget by as much as 15% of the total budget. Any expenditures in excess of this authorization will require a further order of the Court after appropriate notice. Budget savings for the Debtors in any month would be carried over and used by the Debtors in subsequent months (*i.e.*, to account for changes in the timing of expenditures by the respective Debtors). After the expiration of the term of the budgets, the Debtors would be able to obtain use of any cash collateral of the above-listed Secured Creditors by filing and serving an amended budget; if

no objection to the terms of such budget is filed within 10 days after the service of such budget, the budget will be deemed to have been approved.

10. As adequate protection for the use of BofA's collateral, the Debtors propose to: (a) grant BofA replacement liens in each of the respective Debtors' post-petition cash, accounts, equipment, inventory and the proceeds of the foregoing to the extent of the Debtors' utilization thereof; provided, however, that any and all such replacement liens would be of the same nature, character, validity, priority, dignity, extent and effect as the prepetition liens of BofA had, if any, in such collateral prior to the Petition Date and shall be without prejudice to the rights of the Debtors or any other party in interest to challenge the nature, character, validity, priority, dignity, extent and effect of any such liens or commence any proceeding under the Bankruptcy Code seeking a determination with respect thereto or seeking to avoid or set aside any such liens; and further provided that such replacement liens would specifically exclude avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof (collectively, the "Replacement Liens"); and (b) provide BofA copies of such financial or operating reports as filed with the Office of the U.S. Trustee. The Debtors would not waive any right to contest the rights of the Secured Creditors to receive adequate protection. In addition, any liens granted or cash to be paid to the Secured Parties would be limited to actual and demonstrated diminution in the value of such Secured Creditor's collateral.

## **BACKGROUND**

11. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtors have continued in possession of their property and are managing their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     As of the Petition Date, the Debtors operate 92 separate franchise locations: 39 in Minnesota; 28 in Missouri; 17 in Illinois; 12 in Wisconsin; 3 in Iowa; and 1 in Kansas.

13.     Duke and King Acquisition Corp. ("D&K Acquisition") was formed in November 2006, to acquire 88 Burger King franchise restaurants from the Nath Companies ("Nath"). The acquisition was funded by approximately $11.2 million in equity contributions from Kinderhook Capital Fund I and $17 million of debt provided by Bank of America, N.A. ("BofA"). At the time of the acquisition, Burger King Corporation ("BKC") and Kinderhook Industries ("Kinderhook") recognized that the stores being purchased were significantly behind on both successor and CAPEX commitments. Notwithstanding the significant CAPEX requirements, D&K Acquisition decided to move forward with the Nath acquisition, based in part, on guidance from BKC that there would be opportunities in the near future to bolster its platform with additional acquisitions. The Nath acquisition also included 12 restaurants in Florida, which D&K Acquisition planned on selling shortly after closing the transaction so that it could focus on its core Midwest market.[1]

14.     Shortly after the Nath acquisition, D&K Acquisition formed Duke and King Missouri, LLC ("D&K Missouri" and with D&K Acquisition, the "Company") to purchase 24 restaurants in Missouri, known at the time as the Swisshelm Group ("Swisshelm"). Like the Nath restaurants, the Swisshelm assets were in poor condition and were also in need of significant operational and capital improvements. For example, in the first six months following the Swisshelm acquisition, 20 of the 23 regional managers and three of the four area managers were replaced in that market. This high turnover, while ultimately improving on-going operations, initially hurt productivity and added significant replacement and training costs.

---

[1] In July 2007, D&K Acquisition sold four of the 12 Florida restaurants purchased as part of the Nath acquisition. Ten months later, BKC acquired seven of the Company's remaining Florida locations and converted them to corporate stores.

Additionally, the CAPEX required to bring the stores to acceptable conditions exceeded original estimates by over 140%. If D&K Missouri had not purchased the Swisshelm locations, there was a high probability that the majority of the 24 stores would have been closed or converted to another concept.

15.     After the Swisshelm acquisition, the Company continued to seek additional growth opportunities in an effort to "average in" low CAPEX and "clean EBITDA" to bolster the overall strength and value of its portfolio.  In May 2007, the Company signed a letter of intent to purchase 66 restaurants from Simmonds Restaurants in the Omaha and Des Moines markets. However, BKC did not approve the Company's purchase of the Omaha and Des Moines markets. Unfortunately, this development set back the Company's business plan and handcuffed its ability to "average in" better-conditioned stores with advantageous operating results.  Its plan to use cash flow from stronger locations to fund CAPEX at older restaurants could not, as a result, work.  The Company was left with increasingly troubled assets requiring high CAPEX dollars without the ability to leverage better performing stores.

16.     The need to spend CAPEX dollars has been a constant drain on the Company. Since its inception, the Company has reinvested all of its excess cash flow into the restaurants and spent over $8.75 million on CAPEX ($4.0 million in 2007, $1.9 million in 2008, $2.3 million in 2009 and approximately $600 thousand year-to-date in 2010).  Moreover, to meet additional CAPEX obligations, the Company performed sale-leasebacks of all of its real property holdings – 10 stores in 2008 and 3 stores in 2009 — generating approximately $13.3 million.  Of that amount, approximately $10.5 million was used to pay down debt and approximately $2.8 million was reinvested in the restaurants.

17.     The Company's chapter 11 filing is driven by both macroeconomic factors and the Company's acute short-term liquidity problems. The Company finds itself in a situation in which its growth opportunity is limited by economic reality and its agreements with Burger King. The prolonged recession has greatly reduced customer traffic in its stores, driving down cash flow. In short, the Company's year-to-date financials have fallen short of projections. For the eleven periods[2] ended November 4, 2010, sales are $81.7 million, which is $5.4 million short of projections. Through this fiscal year, the BKC system has experienced same store sales declines for the past several quarters. Over the past four periods, the Company has experienced sales declines of 4.4% (period 8), 10% (period 9), 2.7% (period 10), 5.2% (period 11) and 11.1% (period 12 to date). Furthermore, through period eleven, the Company's same store sales are down 4.0% from 2009. Restaurant margins have come under increased pressure with the impacts of winter weather, value promotions such as the "$1 Double Cheeseburger" and fluctuations in commodity prices, which have contributed to a decline in EBITDAR (Earnings before Interest, Taxes, Depreciation, Amortization and Rent) of over 9% in the past two years. Although the Company continues to maintain a high level of operating efficiency, and 90% of its restaurants have received "excellent" or "good" ratings from BKC, operating margins have not been sufficient to meet the restaurants' required CAPEX.

18.     On March 29, 2010, as it addressed its liquidity problems, the Company was sued by BKC for breach of post-termination obligations under certain of BKC's franchise agreements. The litigation was resolved by the Company executing a Limited License Agreement with BKC, which, among other things, requires a sale of 52 of the Company's franchise locations on or

---

[2] The Company uses "periods" rather than "months" in its financial reporting. A "period" is equal to 4 weeks. Period 1 represents the first 4 weeks of their year; period 13 represents the last 4 weeks of the year.

before December 30, 2010. After that date, the Company's rights under 52 of their BKC franchise agreements will terminate, absent an extension from BKC.

19.     Since October, 2010, the Company has been working on a short-term solution of its liquidity issues with BKC, as well as a long-term plan that would align the Company with BKC's new vision for improving the Burger King brand name. The Company also reached out to BofA to discuss the Company's financial condition. The Company, BKC and BofA (and their respective advisors) met several times leading up to the Petition Date. As a result of these meetings, the parties agreed to a deferral of principal and interest payments to BofA and the deferral of franchise, advertising (except for local advertising) and royalty fees to BKC. Among other conditions, and similar to the requirement of the Limited License Agreement, the Company was required to engage the services of an investment banker to market the assets and sell the business. The Company has retained an investment banker who has commenced a professional process to find a buyer or buyers for the business in order to maximize the value of the enterprise. Through the parties' collaborative efforts, the Company was able to continue to operate until a consensual long-term deal could be finalized. However, the Company's acute cash needs — obligations to BofA, BKC, landlords and vendors — coupled with lagging revenues and the beginning of the Company's slow season, necessitated a filing under chapter 11 of the Bankruptcy Code in order to preserve the value of the business. The filing will also provide time and liquidity to market and sell the business.

20.     D&K Acquisition and its subsidiaries included in the chapter 11 filing are all borrowers under the credit facility with BofA. D&K Acquisition and its subsidiaries fall into the following categories:

**Operating Companies**

21.     Duke and King Acquisition Corp.  Headquartered in Burnsville, MN, it is a Delaware corporation and 100% owner of both Duke and King Missouri Holdings, Inc. and DK Florida Holdings, Inc.  It employs senior executive management and operates restaurants in Minnesota, Wisconsin, Iowa and Illinois.

22.     Duke and King Missouri, LLC.  Headquartered in Burnsville, MN, it is a Delaware limited liability company and operates restaurants in Missouri and Kansas, but is wholly owned by Duke and King Missouri Holdings, Inc.

**Holding Companies**

23.     Duke and King Missouri Holdings, Inc.  It is a Delaware corporation holding company that owns 100% of D&K Missouri.

24.     DK Florida Holdings, Inc.  It is a Delaware corporation that serves as a holding company that formerly owned 100% of DK Florida, LLC (which was cancelled in September 2009).

25.     Duke and King Real Estate, LLC.  It is a Delaware limited liability company that used to own real estate in fee for certain locations, but divested itself of those holdings as of 2009.

26.     A chart depicting the Debtors' organizational structure is as follows:



[1]Duke and King Acquisition Corp. is 100% owned by Duke and King Holdings, Inc.

27.     The Debtors' primary secured financing is through a credit facility with BofA, with obligations totaling approximately $11,000,000 as of December 1, 2010.

## PRE-PETITION FINANCING FACILITIES

### A.     BofA Secured Credit Facilities

28.     D&K Acquisition and Duke and King Florida, LLC ("D&K Florida" and sometimes together with D&K Acquisition referred to herein as the "Original BofA Borrowers"), as borrowers, entered into a Credit Agreement dated as of November 1, 2006, with BofA, as Lender and Administrative Agent (the "Credit Agreement"). The original commitment amount under the Credit Agreement was $23.5 million, consisting of: (a) a term loan in the initial principal amount of $15 million ("Term Loan A"); (b) a term loan in the initial principal amount of $1 million ("Term Loan B"); and (c) an acquisition note in the initial principal amount of $7.5 million ("Acquisition Note," and collectively with Term Loan A and Term Loan B, the "Original BofA Notes").

29.     The maturity date of each of the Original BofA Notes is November 1, 2011.  The Credit Agreement is governed by the laws of the State of New York.  Kinderhook Capital Fund I, L.P. originally guaranteed the Original BofA Borrowers' obligations to BofA under the Credit Agreement, but such guaranty was released by BofA on July 18, 2008.

30.     On March 1, 2007, the Original BofA Borrowers, Duke and King Real Estate, LLC ("D&K Real Estate"), and D&K Missouri (D&K Missouri, the Original BofA Borrowers and D&K Real Estate, are collectively referred to herein as the "BofA Borrowers"), entered into a First Amendment to Credit Agreement with BofA (the "First Amendment").  The commitment amount under the Credit Agreement, as amended by the First Amendment, was increased to $33.262 million, consisting of: (a) Term Loan A in the initial principal amount of $15 million; (b) Term Loan B in the initial principal amount of $1 million; (c) a reduction in the principal amount of the Acquisition Note to $3.5 million; (d) a new term loan in the initial principal amount of $5.826 million ("Term Loan C"); and (e) a new term loan in the initial principal amount of $7.936 million ("Term Loan D").  Term Loan A, Term Loan B, the Acquisition Note, Term Loan C and Term Loan D are collectively referred to herein as the "BofA Notes."

31.     Non-debtor Duke and King Holdings, LLC ("D&K Holdings") executed and delivered an unconditional guaranty agreement to BofA on March 1, 2007.

32.     On February 24, 2009, the BofA Borrowers and BofA entered into a Second Amendment to Credit Agreement.  On December 17, 2009, the BofA Borrowers and BofA entered into a Third Amendment to Credit Agreement.  As part of these amendments, BofA consented to the sale and leaseback of certain real property and the sale of certain restaurants located in Florida.

33.     As of December 1, 2010, according to the books and records of the Debtors the BofA Borrowers' outstanding obligations to BofA under the BofA Notes total approximately: (a) $9,247,144 on Term Loan A; (b) $0.00 on Term Loan B; (c) $1,655,283 on Term Loan C; and (d) $24,037 on the Acquisition Note (aggregate total of $10,926,464). Term Loan D is paid in full. The BofA Notes are currently accruing interest at an annual rate equal to 4.49%, plus a 2% default rate.

34.     In the Credit Agreement, as amended and modified, the BofA Borrowers granted BofA a security interest in the assets set forth on <u>Exhibit B</u> attached hereto and incorporated herein by reference (collectively, the "BofA Collateral").

35.     BofA is claiming that is has a blanket lien on all of the assets of the BofA Borrowers. The Debtors dispute that BofA has a perfected security interest in the Debtors' cash and future cash generated from restaurant sales.

**B.      Warren Capital Corporation**

36.     In 2009 and 2010, D&K Acquisition and D&K Missouri entered into various equipment financing agreements with Warren. Warren is claiming a security interest in the equipment and proceeds of such equipment, but not the Debtors' inventory. The Debtors dispute that Warren has a perfected security interest in the Debtors' cash. In addition, the Debtors are current in their payments to Warren.

**C.      The Coca-Cola Company**

37.     In 2008 and 2009, D&K Acquisition entered into various Security Agreements and Notes with Coca-Cola to finance the purchase of certain post-mix beverage dispensing equipment, icemakers, ice dispensers, menu boards and other equipment (collectively, the "Coca-Cola Equipment"). Coca-Cola is claiming a security interest in the Coca-Cola Equipment and proceeds thereof, but not the Debtors' inventory. The Debtors dispute that Coca-Cola has a

perfected security interest in the Debtors' cash. In addition, the Debtors are current in their payments to Coca-Cola.

**D.     Duke Manufacturing Company**

38.     In 2009, D&K Acquisition entered into various equipment agreements with Duke Manufacturing Co. ("Duke") to purchase certain kitchen equipment. Duke is claiming a purchase money security interest in the Duke equipment and the proceeds thereof, but not the Debtors' inventory. The Debtors dispute that Duke has a perfected security interest in the Debtors' cash. In addition, the Debtors have paid for the Duke equipment in full.

**E.     Meadowbrook Meat Company, Inc.**

39.     In 2006, MBM filed a financing statement covering all of D&K Acquisition's right, title and interest in all current and after-acquired inventory. MBM is claiming a security interest in D&K Acquisition's food and supply inventory and the product and proceeds thereof. The Debtors' have filed a motion with the Court requesting authority to pay the pre-petition amounts owed to MBM as a critical food vendor.

**F.     Burger King Corporation**

40.     D&K Acquisition and D&K Missouri (together, the "BKC Licensees") have entered into various BURGER KING® Restaurant Franchise Agreements with BKC (collectively, the "Franchise Agreements"). As noted above, the BKC Licensees operate 92 BURGER KING® restaurants in Iowa, Illinois, Kansas, Minnesota, Missouri and Wisconsin (collectively, the "Restaurants").

41.     Pursuant to the terms of the Franchise Agreements, the BKC Licensees owe BKC certain advertising and royalty fees each month. The aggregate monthly total of the advertising and royalty fees is approximately $665,000.

42. On June 30, 2010, BKC, the BKC Licensees and certain non-debtor guarantors, executed and delivered that certain Limited License Agreement (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Limited License Agreement").

43. BKC does not have a security interest in any of the Debtors' assets to secure the obligations owed to BKC under the Franchise Agreements or the Limited License Agreement. Certain non-debtors have guaranteed the BKC Licensees' obligations to BKC under the Limited License Agreement.

## USE OF CASH

44. The Debtors request an expedited hearing for an interim Order authorizing the Debtors to use cash in which the Secured Creditors may claim an interest. The Debtors assert that none of the Secured Creditors listed above has a perfected security interest in the Debtors' cash or future sale proceeds generated from the provision of services at the Restaurants. The Debtors further assert that there is cause for ordering an expedited hearing on the Motion for the reasons set forth herein. The Debtors will suffer irreparable harm if they cannot utilize their cash on a preliminary basis, pending a final hearing on this Motion. This request relates specifically to the current payroll to be distributed on or after December 7, 2010, and the additional use of cash that is contemplated being utilized substantially in accordance with the Budget (defined below) in the ordinary course as non-cash collateral items.

45. Reasonable notice of the request for an expedited hearing was given by telephonic, facsimile or e-mail notice to each of the Secured Creditors, the U.S. Trustee, and the Debtors' 10 largest unsecured creditors. The interests of a creditor wishing to object to the use of cash collateral are protected and preserved by the opportunity to object and be heard.

46.     The Debtors need the immediate use of cash to meet the on-going expenses of operating their businesses, including making the next payroll for employees which will occur on or after December 7, 2010 in the approximate amount set forth in the Budget (the "Pending Payroll Obligations") and paying payroll taxes and related employee expenses, as well as payments to trade vendors for post-petition purchases, payment of rent, utility deposits, telephone, insurance, payments to other parties that supply goods and services to the Debtors post-petition and other necessary expenses associated with the administration of the bankruptcy estates. Further, the Debtors pay approximately $560,000 per week for food and other supplies and require immediate use of cash to replenish inventory and continue ordinary course business operations. These expenses are more specifically set forth in the Debtors' cash flow projections and budget for the business attached hereto as Exhibit A (the "Budget"). The Debtors have an immediate need to use approximately $6,779,527 between the Petition Date and December 31, 2010, in accordance with the attached Budget. Payment of all of these amounts are necessary to avoid immediate and irreparable harm to the Debtors' bankruptcy estates pending a hearing on the Motion and, to the extent that the Court characterizes the Debtors' cash and post-Petition Date sale receipts as cash collateral for some reason, the Debtors by this Motion also seek interim and final authority herein to utilize these proceeds for the benefit of the businesses, the bankruptcy estates and all constituents.

47.     The Debtors utilize the services of a nationally recognized payroll processing service, ADP, to facilitate payroll obligations to its employees. ADP requires good and available funds and, prior to the commencement of the bankruptcy cases, the Debtors transferred funds sufficient to cover the Pending Payroll Obligations. The Debtors seek authorization to pay

prepetition portions of the Pending Payroll Obligations under a separate motion filed contemporaneously with this Motion.

48.     The Debtors anticipate the entry of a final order authorizing the use of cash collateral during the week beginning December 20, 2010.  If the Debtors are unable to timely fund the Pending Payroll Obligations, the Debtors are likely to lose their 2,200 employees and be unable to hire new employees.  In addition, the Debtors must have use of their cash to pay certain critical vendors for goods and services necessary to operate the Restaurants.  Without the interim use of cash as proposed in the Budget, the Debtors will not be able to continue operations and pursue their strategies for maximizing value, and the interests of creditors and other parties in interest in these cases will be irreparably harmed.  Therefore, cause exists to reduce notice of the hearing with respect to an interim order authorizing the use of the Debtors' cash.

49.     The Debtors have cash on hand and will generate cash from continuing sales at the Restaurants.  As set forth in the Budget, the Debtors project that such cash will be sufficient to fund their chapter 11 administrative expenses, including post-petition operating expenses.

50.     As set forth in paragraph 10 above, the Debtors propose to grant BofA the Replacement Liens and will also prepare and provide to BofA copies of financial or operating reports filed with the Office of the U.S. Trustee.  The Debtors' proposed use of unencumbered cash and offer of adequate protection provides adequate protection against the risk of the Debtors' use of cash collateral and furthers the interests of all stakeholders in these bankruptcy cases.

51.     Prior to the hearing on the Motion for a final order authorizing use of cash, and in settlement of any and all matters raised in this Motion, the Debtors may enter into a stipulation or agreed order with parties claiming a security interest in cash collateral assets of the Debtors

concerning the use of cash collateral, adequate protection and other related matters.  In the event that the Debtors enter into any such stipulation, they will seek approval of the stipulation without further notice or hearing pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, and **DEBTORS HEREBY GIVE NOTICE OF THEIR INTENTION TO SEEK APPROVAL OF ANY SUCH STIPULATION.**

52.     Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law proposed order and proof of service.

53.     Pursuant to Local Rule 90l3-2(e), the Debtors hereby give notice that they may, if necessary, call Joseph M. Geraghty of Conway MacKenzie, Inc. (the Debtors' proposed financial advisors), and/or other employees or advisors to the Debtors to testify about the factual matters raised in the Motion.  The business address for Joseph M. Geraghty is 109 N. Main St., 500 Performance Place, Dayton, OH 45402.

WHEREFORE, the Debtors move the Court for an order granting:

A.     An expedited hearing;

B.     The motion for an order authorizing the Debtors, on an interim basis, to use of unencumbered cash, or in the alternative, cash collateral through and including December 31, 2010, substantially consistent with the Budget attached to the Motion;

C.     The request for a final order authorizing the Debtors, on a final basis, to use cash collateral through and including March 25, 2011, substantially consistent with the Budget attached to the Motion; and

D.     Such other and further relief as the Court deems just and equitable.


                                    FREDRIKSON & BYRON, P.A.

Dated:  December 4, 2010            */s/ Clinton E. Cutler*
                                    Clinton E. Cutler (#158094)
                                    Douglas W. Kassebaum (#386802)
                                    Sarah M. Gibbs (#0390238)
                                    200 South Sixth Street, Suite 4000
                                    Minneapolis, MN 55402
                                    Phone (612) 492-7000
                                    Fax (612) 492-7077
                                    ccutler@fredlaw.com
                                    dkassebaum@fredlaw.com

                                    PROPOSED CO-COUNSEL FOR DEBTORS
                                    AND DEBTORS IN POSSESSION


                                    – and –

                                    McDONALD HOPKINS LLC

                                    Shawn M. Riley (OH 0037235)
                                    Scott N. Opincar (OH 0064027)
                                    Michael J. Kaczka (OH 0076548)
                                    600 Superior Avenue, East, Suite 2100
                                    Cleveland, OH 44114-2653
                                    Phone (216) 348-5400
                                    Fax (216) 348-5474
                                    sriley@mcdonaldhopkins.com
                                    sopincar@mcdonaldhopkins.com
                                    mkaczka@mcdonaldhopkins.com

                                    PROPOSED CO-COUNSEL FOR DEBTORS
                                    AND DEBTORS IN POSSESSION

## VERIFICATION

I, Becky Moldenhauer, am the Chief Financial Officer of the Debtors. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in paragraphs 11-27 of the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: December 4, 2010                    Signed: *Becky Moldenhauer*
                                                           Becky Moldenhauer

 

I, Joseph M. Geraghty, declare under penalty of perjury that the facts set forth in paragraphs 27-43 and 46-50 of the preceding Motion and attached exhibits are true and correct according to the best of my knowledge, information and belief.

Date: December 4, 2010

                                          _____
                                          Title: Senior Managing Director
                                          Conway MacKenzie, Inc.

                                          PROPOSED FINANCIAL ADVISOR TO
                                          DEBTORS

## VERIFICATION

I, Becky Moldenhauer, am the Chief Financial Officer of the Debtors. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in paragraphs 11-27 of the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: December 4, 2010

Signed: _____

Becky Moldenhauer


I, Joseph M. Geraghty, declare under penalty of perjury that the facts set forth in paragraphs 27-43 and 46-50 of the preceding Motion and attached exhibits are true and correct according to the best of my knowledge, information and belief.

Date: December 4, 2010

_____

Title: Senior Managing Director
Conway MacKenzie, Inc.

PROPOSED FINANCIAL ADVISOR TO DEBTORS

# EXHIBIT A

## BUDGET

**Duke & King**
**Weekly Cash Flow Forecast**
**In Court Analysis**
**Dollars In Actuals**

| | Filing | Post - Petition --> | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | | 1 | 2 | 3 | 4 | 4 Week | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16 Week |
| Date | 12/3/10 | 12/10/10 | 12/17/10 | 12/24/10 | 12/31/10 | Total | 1/7/11 | 1/14/11 | 1/21/11 | 1/28/11 | 2/4/11 | 2/11/11 | 2/18/11 | 2/25/11 | 3/4/11 | 3/11/11 | 3/18/11 | 3/25/11 | Total |
| **Beginning Book** | 396,774 | 489,253 | 420,682 | 638,580 | 396,774 | | 536,424 | 393,402 | 187,149 | 415,114 | 470,520 | 212,483 | 367,918 | 296,327 | 701,713 | 296,156 | 407,442 | 770,184 | 396,774 |
| **Receipts:** | | | | | | | | | | | | | | | | | | | |
| Sales | | 1,706,794 | 1,706,794 | 1,706,794 | 1,706,794 | 6,827,177 | 1,649,085 | 1,695,540 | 1,695,540 | 1,695,540 | 1,797,464 | 1,843,000 | 1,843,000 | 1,843,000 | 1,857,826 | 1,907,348 | 1,907,348 | 1,907,348 | 28,469,220 |
| Management Fees | | 12,000 | | | 50,000 | 62,000 | | 12,000 | | 50,000 | | 12,000 | | 50,000 | | 12,000 | | 50,000 | 248,000 |
| Other Deposits | | 7,500 | 7,500 | 7,500 | 7,500 | 30,000 | 7,500 | 7,500 | 7,500 | 332,500 | 7,500 | 7,500 | 369,610 | 7,500 | 655,571 | 7,500 | 7,500 | 7,500 | 807,110 |
| **Total Credits** | | 1,714,294 | 1,726,294 | 1,714,294 | 1,764,294 | 6,919,177 | 1,656,585 | 1,715,040 | 1,703,040 | 2,078,040 | 1,804,964 | 1,862,500 | 1,850,500 | 2,262,610 | 1,865,326 | 1,926,848 | 1,914,848 | 1,964,848 | 29,524,330 |
| **Operating Disbursements:** | | | | | | | | | | | | | | | | | | | |
| Payroll | | 605,000 | 610,000 | 570,054 | 615,740 | 2,400,794 | 545,054 | 570,740 | 540,054 | 585,740 | 565,054 | 595,740 | 565,054 | 610,740 | 570,054 | 590,740 | 570,054 | 610,740 | 9,320,561 |
| Food Vendors (Excl Bread) | | 560,000 | 560,000 | 531,372 | 531,372 | 2,182,745 | 501,372 | 501,372 | 509,484 | 509,484 | 569,484 | 569,484 | 567,362 | 567,362 | 577,362 | 577,362 | 577,118 | 577,118 | 8,787,109 |
| AP Ordinary Course Checks | | 175,673 | 204,750 | 204,750 | 204,750 | 789,923 | 222,923 | 203,538 | 222,923 | 222,923 | 198,692 | 295,615 | 222,923 | 222,923 | 272,596 | 224,135 | 224,135 | 224,135 | 3,547,385 |
| Rent | | - | - | - | 449,137 | 449,137 | 192,643 | 125,000 | - | - | 540,571 | - | 125,000 | - | 655,571 | - | - | - | 2,087,922 |
| Sales Taxes | | 48,269 | 288,269 | 138,269 | 29,000 | 503,807 | 36,164 | 296,164 | 151,164 | 53,163 | 47,748 | 46,748 | 262,748 | 117,748 | 43,848 | 283,848 | 133,848 | 24,579 | 2,001,579 |
| Royalty / Advertising To BK | | 25,000 | - | - | - | 25,000 | - | 25,000 | - | - | - | 25,000 | - | - | 25,000 | - | - | - | 100,000 |
| Employee Benefits | | 145,000 | 54,000 | 18,105 | 2,605 | 219,710 | 87,605 | 137,605 | 22,605 | 2,605 | 112,605 | 112,605 | 22,605 | 2,605 | 122,605 | 52,605 | 18,105 | 14,105 | 927,967 |
| Real Estate/ Property Taxes | | - | 35,000 | - | - | 35,000 | - | - | - | 256,873 | - | - | 127,552 | - | - | - | - | 97,000 | 516,426 |
| Capital Expenditures | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Banking Fees | | - | 9,000 | - | - | 9,000 | - | 9,000 | - | - | - | 9,000 | - | - | - | 9,000 | - | - | 36,000 |
| Other | | 38,846 | 33,846 | 33,846 | 33,846 | 140,385 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 28,846 | 486,538 |
| Total Operating Disbursements | | 1,597,788 | 1,794,865 | 1,496,397 | 1,866,450 | 6,755,500 | 1,614,608 | 1,897,266 | 1,475,076 | 1,659,634 | 2,063,001 | 1,683,038 | 1,922,091 | 1,550,224 | 2,270,883 | 1,791,536 | 1,552,106 | 1,576,522 | 27,811,486 |
| **Professional Fees:** | | | | | | | | | | | | | | | | | | | |
| Financial Advisors | | - | - | - | - | - | - | - | - | 128,000 | - | - | - | 96,000 | - | - | - | 176,000 | 400,000 |
| Legal Counsel | | - | - | - | - | - | - | - | - | 128,000 | - | - | - | 128,000 | - | - | - | 224,000 | 480,000 |
| Local Counsel | | - | - | - | - | - | - | - | - | 32,000 | - | - | - | 16,000 | - | - | - | 32,000 | 80,000 |
| Bank Advisors [1] | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Counsel [1] | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee Advisors | | - | - | - | - | - | - | - | - | 64,000 | - | - | - | 56,000 | - | - | - | 100,000 | 220,000 |
| US Trustee | | - | - | - | - | - | 10,000 | - | - | - | - | - | - | - | - | - | - | 30,000 | 40,000 |
| Investment Banker | | - | - | - | - | - | - | - | - | 11,000 | - | - | - | 11,000 | - | - | - | 17,000 | 39,000 |
| Total Professional Fees | | - | - | - | - | - | 10,000 | - | - | 363,000 | - | - | - | 307,000 | - | - | - | 579,000 | 1,259,000 |
| **Non-Operating Disbursements:** | | | | | | | | | | | | | | | | | | | |
| Utility Deposits | | - | - | - | - | - | 175,000 | - | - | - | - | - | - | - | - | - | - | - | 175,000 |
| Bank of America - Interest / SWAP | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank of America - Principal | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Warren Capital - Broilers | | 24,027 | - | - | - | 24,027 | - | 24,027 | - | - | - | 24,027 | - | - | - | 24,027 | - | - | 96,108 |
| Total Non-Op Disbursements | | 24,027 | - | - | - | 24,027 | 175,000 | 24,027 | - | - | - | 24,027 | - | - | - | 24,027 | - | - | 271,108 |
| **Total Disbursements** | | 1,621,815 | 1,794,865 | 1,496,397 | 1,866,450 | 6,779,527 | 1,799,608 | 1,921,293 | 1,475,076 | 2,022,634 | 2,063,001 | 1,707,065 | 1,922,091 | 1,857,224 | 2,270,883 | 1,815,563 | 1,552,106 | 2,155,522 | 29,341,594 |
| **Ending Book Balance** | 396,774 | 489,253 | 420,682 | 638,580 | 536,424 | 536,424 | 393,402 | 187,149 | 415,114 | 470,520 | 212,483 | 367,918 | 296,327 | 701,713 | 296,156 | 407,442 | 770,184 | 579,510 | 579,510 |

**Notes:**
1) Bank advisor fees to be determined

**Duke & King**
**Weekly Cash Flow Forecast**
**In Court Analysis**
**Dollars In Actuals**

| | Filing | Post - Petition --> | | | | 4 Week | | | | | | | | | | | | | 16 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | | 1 | 2 | 3 | 4 | Total | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | Total |
| Date | 12/3/10 | 12/10/10 | 12/17/10 | 12/24/10 | 12/31/10 | | 1/7/11 | 1/14/11 | 1/21/11 | 1/28/11 | 2/4/11 | 2/11/11 | 2/18/11 | 2/25/11 | 3/4/11 | 3/11/11 | 3/18/11 | 3/25/11 | |
| **Collateral Position:** | | | | | | Change | | | | | | | | | | | | | Change |
| A/R Balance | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | - | 150,000 | 150,000 | 150,000 | 150,000 | 160,000 | 160,000 | 160,000 | 160,000 | 170,000 | 170,000 | 170,000 | 170,000 | 20,000 |
| AR - BD & Popeyes | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | - | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 | - |
| A/R Rebates - RSI | 364,280 | 372,350 | 380,420 | 388,490 | 396,560 | 32,280 | 404,630 | 412,700 | 420,770 | 103,840 | 111,910 | 119,980 | 128,050 | 136,120 | 144,190 | 152,260 | 160,330 | 168,400 | (195,880) |
| A/R Rebates - Coke & Dr. Pepper | 244,764 | 274,100 | 303,437 | 332,773 | 362,110 | 117,346 | 389,918 | 417,726 | 445,534 | 473,342 | 501,151 | 528,959 | 556,767 | 222,465 | 250,273 | 278,081 | 305,889 | 333,697 | 88,933 |
| Inventory | 850,000 | 810,000 | 810,000 | 810,000 | 810,000 | (40,000) | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | 810,000 | (40,000) |
| Total | 1,671,544 | 1,668,950 | 1,706,357 | 1,743,763 | 1,781,170 | 109,626 | 1,817,048 | 1,852,926 | 1,888,804 | 1,599,682 | 1,645,561 | 1,681,439 | 1,717,317 | 1,391,085 | 1,436,963 | 1,472,841 | 1,508,719 | 1,544,597 | (126,947) |
| | | | | | | | | | | | | | | | | | | | |
| **Sr Debt:** | | | | | | | | | | | | | | | | | | | |
| Term Loan A | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | - | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | 9,247,144 | - |
| Term Loan C | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | - | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | 1,655,283 | - |
| Acquisition Note | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | - | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | 24,031 | - |
| | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | - | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | 10,926,458 | - |

## EXHIBIT B

## BANK OF AMERICA COLLATERAL

## TO UCC-1 FINANCING STATEMENT

(a)    Inventory.  All inventory and supplies of whatever nature and kind (including, without limitation, (i) all food and paper inventory, supplies and all other raw materials, components, work in process, finished goods, goods in transit and packing and shipping materials, and (ii) all goods that are returned to or repossessed by Debtor), together with all additions and accessions thereto, replacements therefor, products thereof and documents therefor located at each Unit described on Schedule 1 attached hereto and incorporated herein by this reference (collectively, the "Inventory");

(b)    Accounts.  All "accounts," as such term is defined in the UCC, of Debtor whether now existing or hereafter created or arising, including, without limitation, (i) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by chattel paper (as defined in the UCC) or instruments (as defined in the UCC)) (including any such obligations that may be characterized as an account or contract right under the UCC), (ii) all of Debtor's rights in, to and under all purchase orders or receipts for goods or services, (iii) all of each Debtor's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (iv) all rights to payment due to Debtor for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by Debtor or in connection with any other transaction (whether or not yet earned by performance on the part of Debtor) and (v) all collateral security of any kind, given by any Account Debtor or any other Person with respect to any of the foregoing. (collectively, the "Accounts");

(c)    Equipment.  All equipment and supplies not included in Inventory above (including, without limitation, food storage and preparation equipment, registers, communications equipment, and replacements therefor), together with all additions and accessions thereto located at each Unit described on Schedule 1 attached hereto and incorporated herein by this reference (collectively, the "Equipment");

(d)    Licenses.  All franchises (but only to the extent the franchisor has consented to a security interest and lien), licenses, permits and operating rights granted to or held by the Debtor for each Unit described on Schedule 1 attached hereto and incorporated herein by this reference (collectively, the "Licenses");

(e)    Contracts and Leases.  All (a) (i) contracts and agreements for the purchase of real and personal property, easements and rights of way, (ii) Material Contracts and any rights thereunder, including the right to receive payments, (iii) security agreements, guarantees and other agreements evidencing, securing or otherwise relating to the Accounts or other rights to receive payment, and (iv) other agreements to which Debtor is a party, whether now existing or hereafter arising (collectively, the "Contracts"); (b) lease agreements for real or personal property to which either Debtor is a party, whether now existing or hereafter arising (collectively, the "Leases"); and (c) all other contracts and contractual rights, indemnification rights, and other remedies or provisions now existing or hereafter arising in favor of Debtor (collectively, the "Other Contracts");

(f)    General Intangibles.  All general intangibles including personal property not included above, including, without limitation, (i) customer and supplier lists, books and records (including all of its Records indicating, summarizing, or evidencing the Collateral or liabilities, all of its Records relating to its business operations or financial condition, and all of its goods or general intangibles related to such information), computer programs and other intellectual property rights, insurance policies, tax refunds, (ii) all proprietary trademarks, trademark applications, trade names, trade secrets, patents, patent applications, copyrights, formulas, recipes, industrial designs, software, all goodwill of the business associated with the foregoing, other intellectual property or proprietary rights therein, whether under license or otherwise, and (iii) all payment intangibles (collectively, the "Intangibles");

(g)    Deposit Accounts.  All of Debtor's interest with respect to any "deposit account" as that term is defined in the UCC and, in any event, including, without limitation, any checking or other demand deposit account, time, savings, passbook or similar account maintained with a bank (collectively, "Deposit Accounts");

(h)    Negotiable Collateral.  All of Debtor's letters of credit, letter of credit rights, instruments, promissory notes, drafts and documents, as such terms may be defined in the UCC, and any and all supporting obligations in respect thereof ("Negotiable Collateral");

(i)    Furniture and Fixtures.  All furniture and fixtures not forming a part of real property (including all tables, seating, signage, decorations and other furniture and fixtures), together with all additions and accessions thereto and replacements therefor located at each Unit described on Schedule 1 attached hereto and incorporated herein by this reference (collectively, the "Furniture and Fixtures");

(j)    Investment Property.  All of Debtor's "investment property" as that term is defined in the UCC and, in any event, including, without limitation, all securities, whether certificated or uncertificated, security entitlements, securities accounts, commodity contracts and commodity accounts as such terms may be defined in the UCC, and any and all supporting obligations in respect thereof ("Investment Property");

(k)    Supporting Obligations.  All of Debtor's "supporting obligations" as such term is defined in the UCC, including letters of credit and guaranties issued in support of Accounts, chattel paper, documents, Intangibles, instruments, or Investment Property (collectively, the "Supporting Obligations");

(l)    Miscellaneous Items.  All goods (other than consumer goods, farm products, or Inventory), chattel paper (whether tangible or electronic), documents, supplies, choses in action, commercial tort claims, (including, without limitation, payments received with respect to termination, arbitration or litigation under any Contract), URL's, domain names and licenses, and all other property and assets of whatever type or description not included above (collectively, the "Miscellaneous Items");

(m)    Cash.  All of Debtor's cash, money, certificates of deposit or other assets of each Debtor that now or hereafter come into the possession, custody, or control of any Lender or the Administrative Agent; and

(n)    Proceeds.  All proceeds and products, whether tangible or intangible, of any of the foregoing, and all proceeds of any loss of, damage to or destruction of the above, whether insured or not insured, all other proceeds of any sale, lease or other disposition of any property or

interest therein referred to above, together with all proceeds of any policies of insurance covering any or all of the above, the proceeds of commercial tort claims covering any or all of the foregoing, the proceeds of any award in condemnation with respect to any of the property of the Debtor, any rebates or refunds, whether for taxes or otherwise, and together with all proceeds of any such proceeds, and to the extent not otherwise included, any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral (collectively, the "Proceeds").

In re:

| | |
|---|---|
| Duke and King Acquisition Corp. | Case No. 10-38652 |
| | Chapter 11 Case |
| Debtor. | |

| | |
|---|---|
| Duke and King Missouri, LLC | Case No. 10-38653 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Missouri Holdings, Inc. | Case No. 10-38654 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Real Estate, LLC | Case No.10-38655 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| DK Florida Holdings, Inc. | Case No. 10-38656 |
| Debtor. | Chapter 11 Case |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR (I) EXPEDITED RELIEF, AND (II) INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS' USE OF UNENCUMBERED CASH OR, IN THE ALTERNATIVE, CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION**

## INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned attorneys, submit this Memorandum in support of their Motion.[1] The Debtors request an expedited hearing for an interim Order authorizing the Debtors to use cash in which Bank of America, N.A., as administrative agent ("BofA"), The Coca-Cola Company ("Coca-Cola"), Warren Capital Corporation ("Warren"), Duke Manufacturing Company ("Duke") and/or Meadowbrook Meat Company, Inc. ("MMC," and collectively with BofA, Coca-Cola, Warren and Duke, the "Secured Creditors") may claim an interest, as more

---

[1] Capitalized terms appearing herein that are not otherwise defined shall have the meanings ascribed to such terms in the Motion.

4843615

specifically set forth in the Motion. The Debtors are in the fast food restaurant business, providing sit-down meals to their customers. As a result, the cash generated by the operation of the Debtors' businesses represents payment for services, rather than the purchase of goods or consumption of inventory. Accordingly, under applicable law, the cash generated by the operation of the Debtors' businesses does not constitute cash collateral of the Debtors' Secured Creditors. The Debtors further assert that there is cause for ordering an expedited hearing on the Motion for the reasons set forth herein and in the Motion. The Debtors will suffer irreparable harm if they cannot utilize their cash on a preliminary basis, pending a final hearing on the Motion.

The Debtors estimate that they will need to use an aggregate of approximately $6,779,527 through December 31, 2010 in order to avoid immediate and irreparable harm to the bankruptcy estates, creditors and other parties in interest.

## FACTUAL BACKGROUND

The factual support for the Debtors' Motion and this Memorandum is set forth in the Motion.

## LEGAL ANALYSIS

## II. CAUSE EXISTS TO REDUCE THE NOTICE OF HEARING ON THE MOTION

Fed. R. Bankr. P. 4001(b)(2) provides that the court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion. The Rule further provides that the court may conduct a preliminary hearing before such 14-day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Local Rule 9006-1 provides that notice of hearing must be delivered not later than seven days prior to the hearing date, except that subparagraph (e) provides that the court may reduce

2

the notice of the hearing. In these cases, there are grounds to reduce the notice of the interim hearing and authorize use of unencumbered cash, or in the alternative, cash collateral on a preliminary basis pending the final hearing. The Debtors have an urgent need for use of their unencumbered cash or cash collateral in order to avoid irreparable harm. The Debtors must meet payroll, rents, post-petition trade vendor and other obligations necessary to operate their businesses substantially in accordance with the Budget in order to preserve and maximize value. Unless the Debtors are able to do so, the value of the bankruptcy estates will be greatly diminished. Finally, the notice of this Motion is more than 48 hours prior to hearing and is consistent with the expedited relief contemplated in the local instructions.

## III. THE COURT SHOULD AUTHORIZE DEBTORS' PROPOSED USE OF UNENCUMBERED CASH, OR IN THE ALTERNATIVE, CASH COLLATERAL ON AN INTERIM AND FINAL BASIS SUBSTANTIALLY IN ACCORDANCE WITH THE BUDGET

### A. The Secured Creditors Do Not Have a Perfected Security Interest in the Debtors' Prepetition Cash Held in Accounts at Third-Party Banks

All of the Debtors operating accounts and deposit accounts are located and maintained at banks other than BofA. After a review of the Secured Creditors' respective loan documents and contracts, it does not appear that any of the Secured Creditors hold an account control agreement over such accounts. Consequently, none of the Secured Creditors hold a perfected security interest or lien on the Debtors' prepetition cash. See Uniform Commercial Code ("UCC") § 9-312(a) (a security interest in a deposit account may be perfected only by control under Section 9-314); UCC § 9-313(c) (a secured party takes possession of collateral in the possession of a third party when the person in possession authenticates a record acknowledging that it holds possession of the collateral for the secured party's benefit); UCC § 9-315(c) (providing that a security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected).

**B.    The Secured Creditors Do Not Have an Interest in Revenues Generated from the Debtors' Postpetition Services**

A restaurant generates revenue from two primary sources, the delivery of goods and the delivery of services.  The Secured Creditors may have a lien on certain food products, equipment and/or other assets held by the Debtors as of the Petition Date, and these liens may extend to the "proceeds" of such collateral post-petition.  Notwithstanding the foregoing, these liens do not and will not extend to the cash generated from the "services" component of the Debtors' businesses. See 11 U.S.C. § 552(b).[2]  The cash generated from the provision of services is "after acquired property" and remains free and clear of the alleged liens of the Secured Creditors in the Debtors' cash.    In re Skagit Pacific Corporation, 316 B.R. 330 (9th Cir. BAP 2004) ("Furthermore, revenue generated by the operation of a debtor's business, post-petition, is not considered proceeds if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance).  See also In re Texas Tri-Collar, Inc., 29 B.R. 724 (Bankr.W.D.La. 1983) (pursuant to Section 552, a creditor's pre-petition blanket lien does not extend to post-petition receivables).

In addition to the foregoing, cash generated from restaurant operations does not constitute cash collateral.  See In re Inman, 95 B.R. 479, 480-81 (Bankr. W.D. Ky. 1988) (court held that revenues generated from the operation of a debtor's fast-food restaurants were not proceeds from the sale of inventory that was subject to a creditor's security interest); In re Cafeteria Operators,

---

[2]  Section 552(b) of the Bankruptcy Code states as follows:

Except as provided in sections 363, 506(c), 522, 544, 544, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts or other payments for the use occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b).

L.P., 299 B.R. 400 (Bankr. N.D. Tex. 2003) (court held that revenue generated by debtor's labor, in preparing food for human consumption, was not necessarily subject to a prepetition security interest in raw food inventory); U.S. Trust Nat. Assoc v. Venice MD LLC, 92 Fed. Appx. 948, 953 (4th Cir. 2004) (court held that revenue generated by sale of food in restaurant is not considered proceeds because restaurant establishments are service-oriented businesses); In re Mid-City Hotel Assocs., 114 B.R. 634, 642-43 (Bankr. D. Minn. 1990) (court held that restaurant income is not proceeds of the real property upon which the restaurant is located); In re Zeeway Corp, 71 B.R. 210, 211 (9th Cir. BAP 1987) (court held that income is not proceeds of real property but the result of services provided by the business); Everett Home Town Limited P'ship, 146 B.R. 453, 456 (Bankr. D. Ariz. 1992) (court held that restaurant revenue cannot be considered proceeds because such revenue is the result of services provided by the business); In re GGVXX, Ltd., 130 B.R. 322 (Bankr. D. Colo., 1991); In re McCann, 140 B.R. 926 (Bankr. D. Mass. 1992) (cash obtained from operation of a restaurant are not proceeds from the sale or disposition of inventory (*e.g.*, food products), but rather proceeds from the provision of services); In re Corner Pockets of the Southwest, Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (court held that restaurant revenues result form services and are not proceeds of real property upon which restaurant is located).

In the Inman case, the Bankruptcy Court for the Western District of Kentucky noted that the restaurant industry, in general, is a service-oriented industry. In comparison with food wholesalers and retailers who sell food products in their natural or packaged state, restaurants expend a great deal of time and energy preparing individual food orders by transforming these natural or packaged foods into menu items. The Inman court also remarked that, as in any business, the cost of preparing such foods for human consumption is without a doubt passed on

to the consumer.  Id.  The court found that revenues generated by a fast food restaurant did not constitute proceeds from the sale of inventory.  Id. at 481.  The court held that the secured lender did not have a valid, perfected security interest in the resulting cash deposits and concluded that the debtor's postpetition cash was free of the prepetition interests of the secured lender.   The court in Cafeteria Operators reached a similar conclusion, holding that, at most, a portion of the cash received by a restaurant from its patrons constituted proceeds from the sale of inventory; the bulk of the proceeds represented payment for services.  Cafeteria Operators, 299 B.R. 409.  As a result, the Debtors' position that the Secured Creditors do not have an interest in the Debtors' cash is amply supported by the Bankruptcy Code and relevant case law.

**C.     The Debtors Should Be Authorized to Use Their Cash Pursuant to 11 U.S.C. §§ 361 and 363**

In United Savings v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.Ct. 626 (1988), the United States Supreme Court analyzed and quantified the parameters of the "interest in property," referenced in sections 361, 362(d)(1), and 363, which the Bankruptcy Code undertakes to protect, where required, through adequate protection.   This analysis led the Supreme Court in Timbers to the conclusion that the "interest in property" referenced in the above sections of the Bankruptcy Code means, and is limited to, the "value of the Collateral." Timbers, 108 S.Ct. at 630.   Therefore, under the Timbers analysis, the adequate protection provisions in the Bankruptcy Code protect a secured creditor only from a potential diminution in the value of that creditor's collateral during the post-petition period.  Id.

Section 361 of the Bankruptcy Code provides that periodic cash payments, replacement liens, or relief constituting the "indubitable equivalent" of the creditor's interest may provide adequate protection.  See 11 U.S.C. § 361.  In addition, section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may engage in transactions, including the use of

unencumbered cash, in the ordinary course of its business, and may use cash collateral only with the secured creditor's consent or if the Court, after notice and a hearing, authorizes such use.  See 11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that the Court must provide the secured creditor with adequate protection of its interest upon request of the creditor. The Eighth Circuit Court of Appeals has reasoned that:

> In any given case, the Bankruptcy Court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risk to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects values as nearly as possible against risk to that value consistent with the concept of indubitable equivalence.

In re Martin, 761 F.2d 472, 476-77 (8th Cir. 1985).

The "value" oriented adequate protection analysis adopted by the Supreme Court in the Timbers case has been closely adhered to by the courts which have subsequently had occasion to address this issue.  See e.g., In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (so long as the receivables being collected and used by the debtor are being replaced by sufficient new receivables in which the creditor is granted a security interest, the creditor is adequately protected); In re Johnson, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); In re Century Inv. Fund, VII Ltd. Partnership, 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) (where value of collateral appears to be stable, secured creditor is not entitled to adequate protection payments); In re Anderson, 86 B.R. 877, 889 (Bankr. N.D. Ind. 1988) (secured creditor was required to show a necessity for adequate protection by demonstrating a decline in asset value from the petition date); In re Kessler, 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) (under Timbers, movants are not entitled to adequate protection payments, as there was no showing that property was depreciating in value).

Other courts have found that adequate protection is not necessary where the collateral is not depreciating in value. In <u>In re Elmore</u>, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988), the Honorable Samuel Bufford held that:

> [T]he Court finds that the property is not depreciating in value. In consequence, the Court finds that Lomas [Secured Creditor] is adequately protected by the value of its collateral.... The right to receive payments is a simple contract right, that supports only a claim in the bankruptcy case. There is no other adequate protection to which Lomas is entitled under the Bankruptcy Code.

<u>Elmore</u>, supra, 94 B.R. at 677 (citation omitted). Similarly, in <u>In re McCombs</u>, the Honorable John E. Ryan held that:

> The analysis of the Supreme Court in Timbers is instructive here. The phrase "interest in property" in § 363(e) means the value of the collateral. That is the interest that I am required to protect. If that value is likely to diminish during the time of the use, adequate protection must be provided by the Debtor.

<u>McCombs</u>, supra, 88 B.R. at 266 (emphasis added).

Under the strict value-oriented analysis adopted by the Supreme Court in <u>Timbers</u> (and adhered to by the cases cited above), the adequate protection inquiry under section 363(e) of the Bankruptcy Code is limited to determining whether the debtor's use of a secured creditor's collateral will reduce the value of the creditor's collateral base. If the debtor can establish that the proposed use of the collateral will not cause a decline in the value of the collateral, then court authorization of such use is appropriate. Not infrequently, a secured creditor will contend that it somehow has a right to be paid adequate protection payments, post-petition, even where no decline in the value of the collateral is either occurring or anticipated. The Supreme Court in <u>Timbers</u> expressly rejected this very contention stating:

> It is obvious (since §§ 361 and 362(d) (1) do not entitle the secured creditor to immediate payment of the principal of his collateral) that this "realization" is to "result" not at once, but only upon

completion of the reorganization. It is then that he must be assured "realization ... of the indubitable equivalent" of his collateral.

Timbers, 108 S.Ct. at 633.

Here, as set forth above, the Debtors assert that neither the cash currently in the possession of any of the Debtors nor any cash generated from post-Petition Date sales at the Restaurants constitute cash collateral but, rather, represents unencumbered cash proceeds available for use by the Debtors. Although the Debtors believe that the Secured Creditors do not have an interest in the Debtors' cash, the Debtors are prepared to provide adequate protection to BofA, which does claim a security interest in the proceeds from the sale of inventory. Such adequate protection would cover the Debtors' use of those assets in which BofA is claiming an interest — including machinery, equipment, and inventory — as well as the Debtors' use of cash to the extent such cash is determined to be BofA's cash collateral.

Under the Debtors' adequate protection proposal, as set forth in paragraph 10 of the Motion, BofA's interests in any of its collateral will be adequately protected from a diminution in value through the Replacement Liens granted to BofA, through the receipt of timely financial information, and through the maintenance and preservation of the Debtors' businesses and going concern value. Any Replacement Lien would exclude any causes of action under chapter 5 of the Bankruptcy Code or the proceeds thereof, and would be enforceable in an amount equal to the aggregate post-Petition Date diminution in the value of BofA's interest in its collateral.

In summary, the adequate protection proposed by the Debtors — a combination of the Replacement Liens, regular reporting, and preservation of the Debtors' going concern value — when taken together adequately protect the Secured Creditors for the use of their collateral. Even if the Court were to determine that BofA does have an interest in the Debtors' cash, permitting the Debtors to utilize cash would be justified in light of the proposed adequate

protection, particularly when coupled with the benefits to the Debtors' restructuring efforts as a result of such use. Thus, the adequate protection proposal offered by the Debtors provides reasonable and adequate protection for the claimed interests of the Secured Creditors. <u>See</u> <u>Martin</u>, 761 F.2d at 476-77.

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should enter an order authorizing the Debtors to use cash collateral on a preliminary basis, and thereafter authorizing the use of cash collateral through and including March 25, 2011, in a manner consistent with the Motion and Budget attached to the Motion. In addition, the Court should grant such further and additional relief as requested in the Motion.

FREDRIKSON & BYRON, P.A.

Dated: December 4, 2010

*/s/ Clinton E. Cutler*
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
ccutler@fredlaw.com
dkassebaum@fredlaw.com

PROPOSED CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

– and –

McDONALD HOPKINS LLC

Shawn M. Riley (OH 0037235)
Scott N. Opincar (OH 0064027)
Michael J. Kaczka (OH 0076548)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474
sriley@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

PROPOSED CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

In re:

| | |
|---|---|
| Duke and King Acquisition Corp. | Case No. 10-38652 |
| | Chapter 11 Case |
| Debtor. | |
| Duke and King Missouri, LLC | Case No. 10-38653 |
| Debtor. | Chapter 11 Case |
| Duke and King Missouri Holdings, Inc. | Case No. 10-38654 |
| Debtor. | Chapter 11 Case |
| Duke and King Real Estate, LLC | Case No. 10-38655 |
| Debtor. | Chapter 11 Case |
| DK Florida Holdings, Inc. | Case No. 10-38656 |
| Debtor. | Chapter 11 Case |

## CERTIFICATE OF SERVICE

Douglas W. Kassebaum, under penalty of perjury, states that on December 4, 2010, he caused to be served the following:

1.  **Notice of Intention to Seek Expedited Hearing;**

2.  **Declaration of Relatedness of Chapter 11 Cases;**

3.  **Notice of Hearing and Joint Motion for (I) Expedited Relief and (II) Interim and Final Orders (A) Authorizing Debtors' Use of Unencumbered Cash or, in the Alternative, Cash Collateral and (B) Granting Adequate Protection;**

4.  Memorandum of Law in Support of Joint Motion for (I) Expedited Relief, and (II) Interim and Final Orders (A) Authorizing Debtors' Use of Unencumbered Cash or, in the Alternative, Cash Collateral and (B) Granting Adequate Protection;

5.  Proposed Interim Order;

6.  Proposed Final Order;

7.  **Notice of Motion and Joint Motion for an Expedited Hearing and for an Order Authorizing Debtors to Pay Prepetition Wages and Employee Benefits and Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief;**

8.     Memorandum of Law in Support of Joint Motion for an Expedited Hearing and for an Order Authorizing Debtors to Pay Prepetition Wages and Employee Benefits and Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief;

9.     Proposed Order;

10.    **Notice of Hearing and Joint Motion for Order (I) Granting Expedited Relief, (II) Authorizing Maintenance of Existing Bank Accounts and Business Forms, (III) Authorizing Continued Use of Cash Management System, and (IV) Waiving the Requirements of 11 U.S.C. § 345(B)**;

11.    Memorandum in Support of Joint Motion for Order (I) Granting Expedited Relief, (II) Authorizing Maintenance of Existing Bank Accounts and Business Forms, (III) Authorizing Continued Use of Cash Management System, and (IV) Waiving the Requirements of 11 U.S.C. § 345(B);

12.    Proposed Order;

13.    **Notice of Motion and Joint Motion for Expedited Hearing and Authorizing Debtors to Pay Prepetition Taxes and Fees and Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief;**

14.    Memorandum of Law in Support of Joint Motion for Expedited Hearing and Authorizing Debtors to Pay Prepetition Taxes and Fees and Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief;

15.    Proposed Order

16.    **Notice of Hearing and Joint Motion for Expedited Hearing and for an Order Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Vendors;**

17.    Memorandum of Law in Support of Joint Motion for Expedited Hearing and for an Order Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Vendors;

18.    Proposed Order;

19.    **Notice of Hearing and Joint Motion for Expedited Relief and for Order Authorizing Debtors to Honor Certain Prepetition Programs to Customer Programs;**

20.    Memorandum in Support of Joint Motion for Expedited Relief and for Order Authorizing Debtors to Honor Certain Prepetition Programs to Customer Programs;

21. Proposed Order;

22. **Notice of Hearing and Joint Motion for Order (I) Granting Expedited Relief, (II) Authorizing Joint Administration of Cases, and (III) Restricting Service under Local Rule 9013-3(A)(2)**;

23. Memorandum in Support of Notice of Hearing and Joint Motion for Order (I) Granting Expedited Relief, (II) Authorizing Joint Administration of Cases, and (III) Restricting Service under Local Rule 9013-3(A)(2);

24. Proposed Order; and

25. Certificate of Service

by sending true and correct copies to all parties on the attached Service List as indicated therein.

Dated:  December 4, 2010          */s/ Douglas W. Kassebaum*
                                            Douglas W. Kassebaum

Duke and King Acquisition Corp. and Related Debtors  -  Bky No. 10-38652
FIRST DAY DOCUMENTS SERVICE LIST
Served via overnight mail except those parties whose contact information includes an e-mail address were served via e-mail

| ***US Trustee and Other Required Parties*** | Attorneys for Burger King Corporation | Attorneys for Bank of America |
|---|---|---|
| U.S. Trustee's Office<br>1015 US Courthouse<br>300 S Fourth St<br>Minneapolis MN 55415<br>ustpregion12.mn.ecf@usdoj.gov | Paul J. Battista<br>Genovese Joblove & Battista, P.A.<br>100 Southeast Second Street, 44th Floor<br>Miami, Florida 33131<br>pbattista@gjb-law.com | Stephen M. Mertz<br>Michael R. Stewart<br>Michael F. Doty<br>Faegre & Benson LLP<br>2200 Wells Fargo Center<br>90 South 7th Street<br>Minneapolis, MN 55402-3901<br>SMertz@faegre.com<br>MStewart@faegre.com<br>MDoty@faegre.com |
| U.S. Trustee's Office<br>1015 US Courthouse<br>300 South Fourth Street<br>Minneapolis MN 55415<br>robert.raschke@usdoj.gov | Swisshelm<br>Attn: Bruce Swisshelm<br>3765 East Turtle Hatch Road<br>Springfield, MO 65809 | |
| IRS District Counsel<br>380 Jackson St, Ste 650<br>St Paul MN 55101-4804 | Reinhart Foodservice LLC<br>230 North Front Street<br>La Crosse, WI 54601<br>rerytilahti@rfsdelivers.com | Attorneys for Bank of America<br>Wendy S. Walker<br>Jonathan K. Bernstein<br>Patrick D. Fleming<br>Morgan, Lewis & Bockius LLP<br>101 Park Avenue<br>New York, NY 10178-0060<br>wwalker@morganlewis.com<br>jbernstein@morganlewis.com<br>pfleming@morganlewis.com |
| Internal Revenue Service<br>Wells Fargo Place<br>30 E 7th St, Mail Stop 5700<br>St Paul MN 55101 | MBM Corporation<br>Attn: Dana Demers<br>P.O. Box 841170<br>Dallas, TX 75284-1170<br>ddemers@mbmfoodservice.com | |
| MN Department of Revenue<br>Collection Enforcement<br>551 Bankruptcy Section<br>600 North Robert Street<br>PO Box 64447<br>St Paul MN 55101-2228 | Sicom Systems  Inc.<br>4140 Skyron Drive<br>Doylestown, PA 18901<br>mdeily@sicom.com | Duke Manufacturing Co.<br>Attn: Officer or Agent<br>2305 North Broadway<br>Saint Louis, MO 63102<br>Fax No. 314-231-5074 |
| US Attorney<br>600 US Courthouse<br>300 S Fourth St<br>Minneapolis MN 55415 | Gilbert Mechanical Cont. inc.<br>4451 West 76th Street<br>Minneapolis, MN 55435<br>mgoelz@gilbertmech.com | GreatAmerica Leasing Corporation<br>Attn: Officer or Agent<br>625 1st Street, SE, Suite 800<br>Cedar Rapids, IA 52401-2031<br>Fax No. 319-365-8607 |
| Minnesota Department of Economic<br>Security<br>332 Minnesota St, Ste E200<br>St. Paul MN 55101-1351 | OI Distribution<br>12900 Southwest 89th Court<br>Miami, FL 33176<br>iliana@originalimpressions.com | Meadowbrook Meat Company<br>Attn: Dana Demers<br>2641 Meadowbrook Road<br>Rocky Mount, NC 27802<br>Fax No. 252-467-4520<br>ddemers@mbmfoodservice.com |
| ***Debtors*** | Pan-O-Gold Baking Co.<br>444 East St. Germain St.<br>St. Cloud, MN 56304<br>info@panogold.com | |
| Duke and King Acquisition Corp.<br>Attn: Becky Moldenhauer<br>12281 Nicollet Ave S<br>Burnsville, MN 55337<br>bmoldenhauer@dukeandking.com | Legacy Enterprises<br>Attn: John Strong<br>1109 S Pickwick Ave<br>Springfield, MO 65804 | Coca-Cola Financial Corporation<br>Attn: Amber Meyer<br>1410 SW Morrison St., #750<br>Portland, OR 97205<br>amber_meyer@leasedimensions.com |
| ***Debtors' 10 Largest Unsecured Creditors*** | ***Major Secured Creditors*** | |
| Kinderhook<br>521 Fifth Ave 34th Floor<br>New York, NY 10175<br>ttuttle@kinderhook.com | Bank of America, N.A.<br>as Administrative Agent<br>600 Peachtree Street, NE,<br>GA1-006-13-20<br>Atlanta, GA 30308<br>Fax No. 404-942-4476 | Warren Capital Corporation<br>Attn: Scott Shapiro<br>100 Rowland Way #205<br>Novato, CA 94945<br>Fax No. 415-892-7075 |
| Burger King Corporation<br>Attn: Frank Taylor<br>PO Box 93290<br>Atlanta, GA 31193-2980<br>ftaylor@whopper.com | | |

In re:

| | |
|---|---|
| Duke and King Acquisition Corp. | Case No. 10-38652 |
| | Chapter 11 Case |
| Debtor. | |

| | |
|---|---|
| Duke and King Missouri, LLC | Case No. 10-38653 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Missouri Holdings, Inc. | Case No. 10-38654 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Real Estate, LLC | Case No.10-38655 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| DK Florida Holdings, Inc. | Case No. 10-38656 |
| Debtor. | Chapter 11 Case |

## FINAL ORDER (A) AUTHORIZING USE OF UNENCUMBERED CASH OR, IN THE ALTERNATIVE, CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION

This case came before the court on the Debtors' Motion for (I) Expedited Relief, and (II) Interim and Final Orders (A) Authorizing Debtors' Use of Unencumbered Cash or, in the Alternative, Cash Collateral and (B) Granting Adequate Protection (the "Motion"). Capitalized terms used, but not otherwise defined herein, shall have the meaning given to them in the Motion. Appearances are noted on the record.

Based on the arguments of counsel and the documents of records herein, the Court being fully advised in the premises, and the Court's findings of fact and conclusions of law having been stated on the record at the close of argument,

**THE COURT FINDS AND CONCLUDES THAT:**

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and reference from the District Court for the District of Minnesota pursuant to 28 U.S.C. § 157. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion was sufficient under the circumstances and constitutes due and sufficient notice thereof.

C.      Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors have retained possession of their assets and are authorized to continue the operations and management of their businesses as debtors in possession.

D.      No official committee of unsecured creditors has been appointed in the chapter 11 cases and no request has been made for appointment of a trustee or examiner.

E.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.

F.      The Debtors' use of cash and other assets is necessary to the continued viability of the Debtors' businesses.

G.      The Debtors assert that Bank of America, N.A. ("BofA"), Warren Capital Corporation, the Coca-Cola Company, Duke Manufacturing Company and/or Meadowbrook Meat Company, Inc. (collectively, the "Secured Creditors") have a lien on or security interests in certain non-cash assets of the Debtors, but have no interest in, or lien on, the Debtors' cash.  The Secured Creditors assert that the Debtors' cash may be Cash Collateral, the use of which requires their consent or an order of the Court.  The Court makes no finding on the issue.  Rather, to the extent the Debtors' cash is Cash Collateral, the Debtors' use of such cash is, as set forth below, authorized and approved.

H.    As of December 1, 2010, according to the books and records of the Debtors the BofA Borrowers' outstanding obligations to BofA under the BofA Notes total approximately: (a) $9,247,144 on Term Loan A; (b) $0.00 on Term Loan B; (c) $1,655,283 on Term Loan C; and (d) $24,037 on the Acquisition Note (aggregate total of $10,926,464).  Term Loan D is paid in full.

I.    BofA is asserting a lien on the assets set forth on <u>Exhibit B</u> to the Motion.

J.    The Debtors have proposed to provide adequate protection to BofA for the use of (i) those assets of the Debtors that are collateral of BofA, and (ii) cash, but only if, and to the extent, the Court later determines that the Debtors' cash is cash collateral of BofA.  The Court makes no determination as to the priority, validity or extent of any lien asserted by the Secured Creditors, or the right of the Secured Creditors to adequate protection.

K.    The evidence presented at the hearing substantiates the Debtors' request for use of cash and other assets.

**IT IS HEREBY ORDERED THAT:**

1    Subject to the terms of this Final Order, the Debtors shall be, and hereby are, authorized to use the cash generated by the operation of their businesses to continue to operate their businesses in the ordinary course of business through March 25, 2011, consistent with the Budget attached hereto as <u>Exhibit 1</u>.  Such authorization shall include, but not be limited to, authorization (a) to pay the Debtors' normal and customary operating expenses, approved chapter 11 expenses, and approved prepetition and postpetition administrative claims; (b) to pay the fees of the United States Trustee pursuant to 28 U.S.C. § 1930; (c) to pay the fees and costs of the professionals retained pursuant to Court order; and (d) to make those payments they are authorized to make pursuant to orders of the Court.  The Debtors shall be deemed to be in

compliance with the Budget and this Final Order if any expenditure, category of expenditures and/or aggregate expenditures for any time period does or do not exceed 115% of the amounts set forth in the Budget. The Debtors are authorized to make the expenditures provided for in the Budget monthly, and if necessary, to exceed the amounts set forth in each respective Budget by as much as 15% of the total Budget.

2      Subject to sections 361 and 363 of the Bankruptcy Code, as adequate protection for the Debtors' use of BofA's collateral, BofA is hereby granted the following: (a) replacement liens, pursuant to 11 U.S.C. § 552, in the Debtors' postpetition assets of the same type and nature as those assets, subject to the prepetition liens of BofA (collectively, the "Replacement Liens"); provided, however, that any and all such Replacement Liens will be of the same nature, character, validity, priority, dignity, extent and effect as BofA had, if any, in such collateral prior to the Petition Date and shall be without prejudice to the rights of the Debtors or any other party in interest to challenge the nature, character, validity, priority, dignity, extent and effect of any such liens or commence any proceeding under the Bankruptcy Code seeking a determination with respect thereto or seeking to avoid or set aside any such liens; and provided further that such Replacement Liens shall specifically exclude all actions under chapter 5 of the Bankruptcy Code and the proceeds thereof; and (b) the right to receive copies of regular financial or operating reports, including those filed with the Office of the U.S. Trustee.

3      Nothing in this Final Order shall operate to waive any of the Debtors' rights to contest the rights of the Secured Creditors to receive adequate protection.

4      Any Replacement Liens granted or cash to be paid to BofA shall be limited to actual and demonstrated diminution in the value of BofA's collateral.

5        Subject to the other provisions of this Final Order, the Replacement Liens granted herein shall be valid and fully perfected without any further action by the Debtors or BofA and without the execution or the recordation of any financing statements, security agreements, mortgages or other documents.  Notwithstanding the foregoing, BofA is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, account control agreements, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Replacement Liens granted to them hereunder.

6        The Replacement Liens granted hereunder shall be subject to the allowed postpetition fees and expenses of professionals retained in the Debtors' chapter 11 cases and the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

7        The provisions of this Final Order, as well as the Replacement Liens and security interests granted herein, shall continue in this and any subsequent case under the Bankruptcy Code.  The Replacement Liens and security interests shall maintain their priority as provided in this Final Order, until the indebtedness of the Debtors to BofA has been completely paid and satisfied, unless otherwise ordered by the Court.

8        This Final Order is without prejudice to the rights of the parties to seek any further or different relief, or modification of this Final Order, including, but not limited to, relief from the automatic stay.

9        Except as expressly provided herein, the rights, claims, and interests of the Debtors, Secured Creditors, and all other parties in interest are hereby reserved.

10      The Court has and will retain jurisdiction to enforce this Order according to its terms.

Dated: _____      _____

United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Duke and King Acquisition Corp. | Case No. 10-38652 |
| | Chapter 11 Case |
| Debtor. | |

| | |
|---|---|
| Duke and King Missouri, LLC | Case No. 10-38653 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Missouri Holdings, Inc. | Case No. 10-38654 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| Duke and King Real Estate, LLC | Case No.10-38655 |
| Debtor. | Chapter 11 Case |

| | |
|---|---|
| DK Florida Holdings, Inc. | Case No. 10-38656 |
| Debtor. | Chapter 11 Case |

## INTERIM ORDER GRANTING EXPEDITED RELIEF AND (A) AUTHORIZING USE OF UNENCUMBERED CASH OR, IN THE ALTERNATIVE, CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION

This case came before the court on the Debtors' Motion for (I) Expedited Relief, and (II) Interim and Final Orders (A) Authorizing Debtors' Use of Unencumbered Cash or, in the Alternative, Cash Collateral and (B) Granting Adequate Protection (the "Motion"). Capitalized terms used, but not otherwise defined herein, have the meanings given to them in the Motion. Appearances are noted on the record.

Based on the arguments of counsel and the documents of records herein, the Court being fully advised in the premises, and after due deliberation and consideration and sufficient cause appearing therefor,

**THE COURT FINDS AND CONCLUDES THAT:**

A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and reference from the District Court for the District of Minnesota pursuant to 28 U.S.C. § 157. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     Notice of the Motion and the Interim Hearing was sufficient under the circumstances and constitutes due and sufficient notice thereof.

C.     Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors have retained possession of their assets and are authorized to continue the operations and management of their businesses as debtors in possession.

D.     No official committee of unsecured creditors has been appointed in the chapter 11 cases and no request has been made for appointment of a trustee or examiner.

E.     The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.

F.     The Debtors' use of cash and other assets is necessary to the continued viability of the Debtors' businesses.

G.     The Debtors assert that Bank of America, N.A. ("BofA"), Warren Capital Corporation, the Coca-Cola Company, Duke Manufacturing Company and/or Meadowbrook Meat Company, Inc. (collectively, the "Secured Creditors") have a lien on or security interests in certain non-cash assets of the Debtors, but have no interest in, or lien on, the Debtors' cash. BofA asserts that the Debtors' cash may be Cash Collateral, the use of which requires its consent or an order of the Court. The Court makes no finding on the issue for purposes of this Interim Order. Rather, to the extent the Debtors' cash is Cash Collateral, the Debtors' use of such cash is, as set forth below, authorized and approved on an interim basis.

H.     As of December 1, 2010, according to the books and records of the Debtors the BofA Borrowers' outstanding obligations to BofA under the BofA Notes total approximately: (a) $9,247,144 on Term Loan A; (b) $0.00 on Term Loan B; (c) $1,655,283 on Term Loan C; and (d) $24,037 on the Acquisition Note (aggregate total of $10,926,464). Term Loan D is paid in full.

I.     BofA is asserting a lien on the assets set forth on <u>Exhibit B</u> to the Motion.

J.     The Debtors have proposed to provide adequate protection to BofA for the use of (i) those assets of the Debtors that are collateral of BofA, and (ii) cash, but only if, and to the extent, the Court later determines that the Debtors' cash is cash collateral of BofA. The Court makes no determination as to the priority, validity or extent of any lien asserted by the Secured Creditors, or the right of the Secured Creditors to adequate protection.

K.     The evidence presented at the hearing substantiates the Debtors' request for use of cash and other assets.

**IT IS HEREBY ORDERED THAT:**

1.     The Debtors' Motion for expedited hearing is granted.

2.     Subject to the terms of this Interim Order, the Debtors shall be, and hereby are, authorized to use the cash generated by the operation of their businesses to continue to operate their businesses in the ordinary course of business through December 31, 2010, consistent with the Budget attached hereto as <u>Exhibit 1</u>. Such authorization shall include, but not be limited to, authorization (a) to pay the Debtors' normal and customary operating expenses, approved chapter 11 expenses, and approved prepetition and postpetition administrative claims; (b) to pay the fees of the United States Trustee pursuant to 28 U.S.C. § 1930; (c) to pay the fees and costs of the professionals retained pursuant to Court order; and (d) to make those payments they are

authorized to make pursuant to orders of the Court. The Debtors are authorized to make the expenditures provided for in the Budget monthly, and if necessary, to exceed the amounts set forth in each respective Budget by as much as 15% of the total Budget.

3.      Subject to sections 361 and 363 of the Bankruptcy Code, as adequate protection for the Debtors' use of BofA's collateral, BofA is hereby granted the following: (a) replacement liens, pursuant to 11 U.S.C. § 552, in the Debtors' postpetition assets of the same type and nature as those assets, subject to the prepetition liens of BofA (collectively, the "Replacement Liens"); provided, however, that any and all such Replacement Liens will be of the same nature, character, validity, priority, dignity, extent and effect as BofA had, if any, in such collateral prior to the Petition Date and shall be without prejudice to the rights of the Debtors or any other party in interest to challenge the nature, character, validity, priority, dignity, extent and effect of any such liens or commence any proceeding under the Bankruptcy Code seeking a determination with respect thereto or seeking to avoid or set aside any such liens; and provided further that such Replacement Liens shall specifically exclude all actions under chapter 5 of the Bankruptcy Code and the proceeds thereof; and (b) the right to receive copies of regular financial or operating reports, including those filed with the Office of the U.S. Trustee.

4.      Nothing in this Interim Order shall operate to waive any of the Debtors' rights to contest the rights of the Secured Creditors to receive adequate protection.

5.      Any Replacement Liens granted or cash to be paid to BofA shall be limited to actual and demonstrated diminution in the value of BofA's collateral.

6.      Subject to the other provisions of this Interim Order, the Replacement Liens granted herein shall be valid and fully perfected without any further action by the Debtors or BofA and without the execution or the recordation of any financing statements, security

agreements, mortgages or other documents. Notwithstanding the foregoing, BofA is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, account control agreements, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Replacement Liens granted to them hereunder.

7. For purposes of this Interim Order only, the Replacement Liens granted hereunder shall be subject to the allowed postpetition fees and expenses of professionals retained in the Debtors' chapter 11 cases and the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

8. The provisions of this Interim Order, as well as the Replacement Liens and security interests granted herein, shall continue in this and any subsequent case under the Bankruptcy Code. The Replacement Liens and security interests shall maintain their priority as provided in this Interim Order, until the indebtedness of the Debtors to BofA has been completely paid and satisfied, unless otherwise ordered by the Court.

9. This Interim Order is without prejudice to the rights of the parties to seek any further or different relief, or modification of this Interim Order, including, but not limited to, relief from the automatic stay.

10. Except as expressly provided herein, the rights, claims, and interests of the Debtors, Secured Creditors, and all other parties in interest are hereby reserved.

11. The Final Hearing is scheduled for _____, 2010 at _____ __.m. before this Court.

The Debtors shall promptly serve copies of this Order in accordance with the local rules applicable to methods of service of motions (which shall constitute adequate notice of the Final

Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Statutory Committee after the same has been appointed, or such Statutory Committee's counsel, if the same shall have been appointed, and the Internal Revenue Service. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) McDonald Hopkins, LLC, 600 Superior Avenue, East, Suite 2100 Cleveland, OH 44114-2653, Attention Scott N. Opincar (sopincar@mcdonaldhopkins.com) (facsimile: 216-348-5474), Fredrikson & Byron, P.A., 200 S. 6th St., Suite 4000, Minneapolis, MN 55402, Attention: Clinton E. Cutler (ccutler@fredlaw.com) (facsimile: 612-492-7077), attorneys for the Debtors; (b) Faegre & Benson, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-3901, Attention: Stephen M. Mertz (smertz@gaegre.com) (facsimile: 612-766-1600), Morgan, Lewis & Bockius LLP, 225 Franklin Street, Boston, Massachusetts 02110, Attention: Jonathan K. Bernstein (jbernstein@morganlewis.com) (facsimile 617-341-7701) and Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York, 10178, Attention: Wendy S. Walker (wwalker@morganlewis.com) (facsimile 212-309-6001), attorneys for Bank of America, N.A.; (c) Genovese Joblove & Battista, P.A., 100 Southeast Second Street, 44th Floor, Miami, Florida 33131, Attention: Paul J. Battista (pbattista@gjb-law.com) (facsimile: 305-349-2310) attorneys for Burger King Corporation, and (d) the Office of the United States Trustee for the District of Minnesota, and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Minnesota, in each case to allow actual receipt by the foregoing no later than December [___], 2010 at 4:00 p.m., prevailing Central time.

12.     The Court has and will retain jurisdiction to enforce this Order according to its

terms.

Dated:                          _____

                                United States Bankruptcy Judge